## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 20-30314** |
| **Neosho Concrete Products Company,** | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |

### ORDER DENYING THE UNITED STATES TRUSTEE'S MOTION TO CONVERT AND DENYING THE UNITED STATES TRUSTEE'S ALTERNATIVE MOTION TO REMOVE THE DEBTOR IN POSSESSION

Daniel Casamatta, the acting United States Trustee, ("UST") brings the present motion to convert this subchapter V case to chapter 7 or, alternatively, to remove debtor Neosho Concrete Products Company as debtor in possession. The UST argues cause exists to convert this case to chapter 7 under 11 U.S.C. § 1112(b)(4) because Neosho is not presently operating and will incur administrative expenses if it continues in subchapter V. Alternatively, the UST argues cause exists to remove Neosho as debtor in possession under 11 U.S.C. § 1185 because Neosho allegedly made preferential transfers to an insider during the preference period.

Because the court determines no cause exists to dismiss or convert at this time, and for the reasons explained below, it DENIES the UST's motion to convert and DENIES the UST's alternative motion to remove the debtor in possession. Neosho may, therefore, remain as a subchapter V debtor in possession.

### JURISDICTION

The court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(a). This matter is statutorily core under 28 U.S.C. § 157(b)(2)(A) and is constitutionally

core.  The court, therefore, has the authority to hear this matter and make a final determination.  No party has contested jurisdiction or the court's authority to make a final determination.

## BACKGROUND

The court derives the following background information from the evidence presented at the April 8, 2021, evidentiary hearing and the record in this case.

Debtor Neosho Concrete Products Company has been operating a manufacturing plant since 1953.  Its current president, Warren Langland, has been working at Neosho since approximately 1982.

Langland authorized Neosho's bankruptcy petition and has been managing Neosho's postpetition operations.  Though he has not received any compensation, he has kept Neosho's equipment and real estate insured, made will-call sales of previously-manufactured inventory, prepared monthly operating reports, and managed the bankruptcy case.  He has simultaneously been working for one of Neosho's creditors, Joplin Concrete, to repay a loan Joplin Concrete made to Neosho that Langland personally guaranteed.

Langland appears to attribute Neosho's financial decline to its relationship with its former marketing and consulting agent, FeHog, LLC.  In 2016, FeHog arranged for Neosho to manufacture recycled rockwool briquettes for a third-party buyer, Owens Corning.  In exchange, Neosho agreed to pay FeHog a commission on the briquettes Neosho sold to Owens Corning.

In early 2019, a billing dispute arose concerning FeHog's commissions.  In September 2019, FeHog obtained a $248,857.64 arbitration judgment against

Neosho. Langland alleges FeHog subsequently "involved Owens Corning" in FeHog and Neosho's legal dispute.

Approximately three months after FeHog obtained its arbitration judgment against Neosho, Owens Corning sent Neosho a letter notifying it that, effective March 31, 2020, Owens Corning was terminating its supply agreement with Neosho. In response, Neosho paused its briquette-manufacturing operations, furloughed its employees, and began negotiating a new supply agreement with Owens Corning.

At the time Neosho paused its manufacturing operations, it held 20,470 tons of unmanufactured rockwool shot (a raw material used to manufacture briquettes) that it alleges Owens Corning owns. Neosho estimates that it would cost more than $2.5 million to remove the unmanufactured rockwool shot from Neosho's premises and dump it at a landfill.

Owens Corning initially appeared willing to negotiate a new supply agreement with Neosho. At least monthly, Langland and Owens Corning representatives met, emailed, and texted about the steps Owens Corning required Neosho to take to obtain a new supply agreement. Among other steps, in the summer of 2020, Owens Corning required Neosho to "[run] a series of trials with a new briquetting formulation" to determine whether Neosho was capable of producing newly-formulated briquettes. Langland testified that to obtain a new supply agreement with Owens Corning, Neosho also had to reject the FeHog consulting agreement.

On July 7, 2020, Neosho filed its chapter 11 bankruptcy petition with this court and made the subchapter V election. Approximately one month later, Neosho filed a

3

motion to reject its executory contract with FeHog.  The court subsequently granted that motion, completing one of the key steps to a new supply agreement between Neosho and Owens Corning.

Neosho completed another key step to a new supply agreement in December 2020, when it finished its trials with the new briquetting formulation.  With the trials complete, Neosho had proved on a small scale its capability to produce the newly-formulated briquettes.  Owens Corning representative Alex Cameron testified that, after Neosho proved capability, "the next step in th[e] process typically is negotiating price and volume targets."

Neosho and Owens Corning began negotiating price and volume terms in December 2020.  Langland and Cameron appear to agree that, during a December 21, 2020, phone call, they negotiated pricing and volume terms and Langland asked Cameron to memorialize those terms in an email.  But their interpretations of the effect of that email differ.  Langland testified that the purpose of the email was to document the terms of the parties' new supply agreement so Neosho could use those terms to propose a subchapter V plan of reorganization.  In contrast, Cameron testified that the purpose of the email was to document the status of the parties' discussions.

To comply with Langland's request, Cameron emailed Langland on December 21, 2020, stating:

> Per our conversation just a moment ago, [Owens Corning] will target 7,600 tons or more of annual briquette consumption at $91.00 [per Short Ton] all-in delivered.  The pricing includes freight for pickup of shot waste/fines from Joplin, manufacturing briquettes at Neosho, and

4

dropping off briquettes at Joplin. We still need an answer from the lawyers on how the outstanding claim of $559,394.05 from previous[] pre-payments will be processed.

Using this pricing and volume information, Neosho filed its subchapter V plan of reorganization on January 5, 2021. Among other things, the plan provides that Neosho will pay its nonpriority, general unsecured creditors a pro rata share of $300,000 over the life of the plan. In contrast, the liquidation analysis attached to the plan estimates that unsecured creditors would receive approximately half that amount on a further-diluted basis in a liquidation, less the cost of any administrative expenses.

The plan also proposes that Langland compensate the estate for the value of money and property he received or repossessed during the preference period. Among other things, the plan requires Langland to voluntarily return "the majority of the property" he repossessed and continue to make payments on the obligation Neosho owes Joplin Concrete, which Langland personally guaranteed.

The plan refers to Neosho and Owens Corning's purported agreement concerning price and volume terms both as a "supply agreement" and as a "memorandum of understanding." For example, the section of the plan that incorporates the price and volume terms from Cameron's December 21, 2020, email is entitled "Post-Bankruptcy Supply Agreement with Owens Corning." Other provisions of the plan also refer to Neosho's purported agreement with Owens Corning as a "Supply Agreement," including the provision stating that Neosho will use "the Supply Agreement with Owens Corning" to fund payments to creditors. But the plan calls the agreement a "memorandum of understanding" twice: when it

5

initially reports that "[Neosho] and Owens Corning have reached a memorandum of understanding," and when it incorporates the pricing and volume terms Cameron emailed Langland on December 21, 2020.

Owens Corning objected to confirmation of Neosho's plan. In its objection, Owens Corning alleges, "[t]here is no supply agreement between Owens Corning and [Neosho] and Owens Corning has no intention of entering into a new supply agreement with [Neosho]." It also gratuitously states, "Owens Corning maintains no ownership interest in the alleged 20,000 tons of rockwool shot at [Neosho's] property."

Neosho subsequently filed an adversary proceeding against Owens Corning. In the adversary proceeding, Neosho alleges it arrived at an enforceable supply agreement with Owens Corning that Owens Corning subsequently breached. Neosho also alleges that Owens Corning owns the rockwool shot on Neosho's premises. Among other relief, Neosho asks the court to enjoin Owens Corning from breaching the purported supply agreement and to order Owens Corning to remove the rockwool shot from Neosho's premises. The adversary proceeding remains pending before this court.

The court held an evidentiary hearing on the UST's motion to convert or remove Neosho as debtor in possession on April 8, 2021. Langland and Cameron each testified at the April 8 hearing. Though the UST focuses in its motion on Neosho's alleged preferential transfers to Langland as "cause" for conversion or removal, at trial, the UST appeared to argue instead that cause exists for conversion because Neosho's continued efforts to reorganize will cause "loss to or diminution of the estate"

6

and Neosho lacks any "reasonable likelihood of rehabilitation" under § 1112(b)(4)(A).
The UST did not address at the evidentiary hearing its request that the court remove
Neosho as debtor in possession under § 1185.

Having outlined the relevant background information, the court turns to the
merits of the present dispute.

## ANALYSIS

### A.    Motion to Convert

The UST asks the court to convert this case to chapter 7 "for cause" under 11
U.S.C. § 1112(b).  As the movant, the UST bears the burden of proof.  *Loop Corp. v.
United States Tr.*, 379 F.3d 511, 517 (8th Cir. 2004).  If the UST satisfies its burden,
the burden will shift to Neosho to produce rebuttal evidence.  *Id.* at 517–18.

Section 1112(b) governs the court's determination of the UST's motion to
convert.  Subsection (b)(1) of that section provides that, subject to exceptions set forth
in §§ 1112(b)(1), (b)(2), and (c), the court shall dismiss a chapter 11 case or convert it
to chapter 7, "whichever is in the best interest of creditors and the estate," if the
movant establishes "cause."  11 U.S.C. § 1112(b)(1).

If cause exists, dismissal or conversion is mandatory "unless the court
determines that the appointment under section 1104(a) of a trustee or examiner is in
the best interests of creditors and the estate," or another exception applies.  *Id.*
§ 1112(b)(1).  *See e.g., In re Keener*, 14-1169, 2017 WL 5054313, at *4 (Bankr. N.D.
Iowa Nov. 2, 2017) (explaining mandatory language in § 1112 post-BAPCPA).  But
the court has broad discretion to determine whether cause exists to dismiss or

convert. *See, e.g.*, *Yehud-Monosson USA, Inc. v. Fokkena (In re Yehud-Monosson USA, Inc.)*, 458 B.R. 750, 754 (B.A.P. 8th Cir. 2011) ("bankruptcy court enjoys broad discretion" under § 1112(b)).

Section 1112(b)(4) provides a non-exhaustive list of circumstances constituting cause for dismissal or conversion. Those circumstances include "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" under § 1112(b)(4)(A). 11 U.S.C. § 1112(b)(4)(A). "The purpose of § 1112(b)[(4)(A)] is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'" *Loop Corp.*, 379 F.3d at 516 (quoting *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)) (construing predecessor to § 1112(b)(4)(A)).

To succeed under § 1112(b)(4)(A), the party requesting conversion must prove two elements: (1) the estate is suffering substantial or continuing loss or diminution, and (2) there is no reasonable likelihood of rehabilitation. 11 U.S.C. § 1112(b)(4)(A). The court will discuss each in turn.

### i.    "substantial or continuing loss to or diminution of the estate"

Section 1112(b)(4)(A) first requires a "substantial or continuing loss to or diminution of the estate." This element includes two subparts: (1) the estate is suffering loss or diminution, and (2) the loss or diminution is either "substantial" or "continuing." 11 U.S.C. § 1112(b)(4)(A).

As to the first subpart, evidence of postpetition negative cash flow may be sufficient in some circumstances to establish loss or diminution. *Loop Corp.*, 379 F.3d at 515–16. Negative cash flow is especially problematic "[i]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets," because in such circumstances, "any negative cash flow—including that resulting only from administrative expenses—effectively comes straight from the pockets of the creditors." *See id.* at 516 (affirming conversion order where debtors intended from the outset to liquidate rather than reorganize, had permanently ceased operations and liquidated virtually all assets, and wished to stay in chapter 11 solely to pursue additional litigation).

As to the second subpart, a loss is "substantial" if it "is sufficiently large . . . to materially negatively impact the bankruptcy estate and interest[s] of creditors." 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][i] (Richard Levin & Henry J. Sommer eds., 16th ed. 2021). Research revealed no authority construing the requirement that a loss be "continuing." Black's Law dictionary defines continuing to mean "[u]ninterrupted; persisting" or "[n]ot requiring renewal; enduring." *Continuing*, *Black's Law Dictionary* (11th ed. 2019). So under its plain meaning, a "continuing loss" must mean a loss that will persist in the future.

In this case, the UST argues the estate is suffering continuing post-petition losses within the meaning of § 1112(b)(4)(A), relying on evidence that, since the petition date, the debtor has (1) earned revenue exclusively from small-scale sales of inventory, (2) incurred attorneys' fees and costs to file an adversary proceeding

9

against Owens Corning and continue in chapter 11, and (3) experienced a decrease in its operating bank account balances.  As a remedy, the UST asks the court to convert the case to chapter 7 or appoint a trustee who would handle any litigation against Owens Corning and the debtor's principal, Warren Langland.

Under other circumstances, the court might agree that Neosho's postpetition administrative expenses and lack of ongoing operations could create a negative cash flow situation sufficient to establish a substantial or continuing loss to or diminution of the estate.  But the unique circumstances of this case compel a different conclusion.

Those unique circumstances are as follows:

When Owens Corning terminated its supply agreement with Neosho in December 2019, Neosho faced two critical problems.  First, it had suddenly lost its primary source of revenue and, as a result, could not fund its ongoing operations and pay its creditors.  Second, it had 20,470 tons of rockwool shot waste blighting its property.

It filed this bankruptcy case to ameliorate both problems.  Early in its bankruptcy case, Neosho rejected its consulting agreement with FeHog, satisfying one prerequisite to a new supply agreement with Owens Corning.  Neosho then continued to negotiate a new supply agreement with Owens Corning.  At the time, Neosho reasonably believed such an agreement was within reach.

Owens Corning initially negotiated with Neosho, and it appears the parties at least came very close to reaching a new supply agreement.  Relying on this purported agreement, Neosho proposed a chapter 11 plan that would enable it to restart

10

operations, fund its plan, and utilize the 20,470 tons of rockwool shot waste on its premises. But Owens Corning subsequently decided not to move forward with the purported supply agreement, allegedly for economic reasons.

Neosho then filed an adversary proceeding against Owens Corning, asking the court to enforce its purported contract with Owens Corning and require Owens Corning to remove the rockwool shot from Neosho's premises. In urging the court to deny the UST's motion to convert, Neosho now argues that its successful prosecution of the adversary proceeding will create value for the estate by reinitiating ongoing operations, making other productive use of its operations, or increasing the value of estate assets.

For the reasons explained below, these unique circumstances prevent the court from characterizing Neosho's ongoing administrative expenses as "substantial or continuing" losses.

First, Neosho's ongoing administrative expenses are not substantial. The parties do not appear to dispute that, due to the devaluing effect of the rockwool shot on Neosho's premises and the high cost of remediation, very little value would be presently available to unsecured creditors if the estate were liquidated without any additional litigation. Consequently, unless Neosho or a trustee creates value by litigating against Owens Corning or getting Langland to compensate the estate for any avoidable preferential transfers, the estate and unsecured creditors have little or no value to lose and the administrative expense claimants bear the primary risk of nonpayment.

11

And there appears to be a real likelihood that a chapter 7 trustee might abandon any cause of action against Owens Corning, together with Neosho's premises, under 11 U.S.C. § 554. For example, a chapter 7 trustee might weigh the administrative burden of litigating the ownership of the rockwool shot waste against the likelihood of increasing the value of Neosho's premises in litigation and decide not to undertake the burden and risk of litigation. A trustee might also abandon Neosho's premises due to the potential environmental impact the rockwool shot waste could have on the premises. Abandonment would deprive unsecured creditors and the estate of any value in the premises and rockwool shot, detrimentally affect any security interests in the premises, and have potentially disastrous environmental consequences.

In contrast, if the court permits Neosho to remain in chapter 11, Neosho proposes to generate value for the estate through ongoing operations and from Langland's voluntary reimbursement for the alleged preferential transfers. Because conversion to chapter 7 alone will not create value for the estate and creditors where little presently exists, the administrative expenses Neosho is incurring in subchapter V to generate value will not "materially negatively impact[] the bankruptcy estate and interest[s] of creditors." Those expenses, therefore, are not substantial.

Nor are Neosho's losses "continuing." Neosho incurred the relevant losses only recently and only after an abrupt change in the circumstances of its case. It still seeks to propose a viable plan that will allow it to resume operations, remediate the rockwool shot waste, generate value for the estate and creditors, and pave the way

12

for a successful rehabilitation. Because Owens Corning's economic decision to end its business relationship with Neosho only recently made Neosho's current plan unworkable, the court cannot yet determine whether Neosho's losses are likely to persist in the future. Moreover, if the court interpreted "continuing loss[es]" to mean those that occur early in a case and before a debtor has had a meaningful opportunity to reverse the circumstances that caused it to seek bankruptcy relief, parties in interest could freely force most chapter 11 debtors to convert simply by asking for conversion early enough in a case. The court declines to set such a precedent. Consequently, the court cannot characterize Neosho's losses as "continuing" at this time.

Unlike in *Loop Corp.*, this is not a case involving debtors who never intended to rehabilitate and now wish to gamble with creditors' money by remaining in a standard chapter 11 case solely to pursue additional litigation. Neosho sought bankruptcy relief to rehabilitate its business, has not liquidated its property, and intends to pursue litigation solely to facilitate its rehabilitation and create value for creditors where little presently exists. As a result, the administrative expenses Neosho is incurring will not "effectively come[] straight from the pockets of the creditors." Moreover, as a subchapter V case, this case differs from *Loop Corp.* because it, by design, has fewer administrative expenses and no unsecured creditors' committee with its own set of professionals charging fees. The Eighth Circuit's analysis in *Loop Corp.*, therefore, does not require conversion in this case.

13

For that reason, and due to the unique circumstances of this case, the court declines at this early stage to characterize Neosho's postpetition administrative expenses as causing a "substantial or continuing loss to or diminution of the estate" under the first element of § 1112(b)(4)(A). Having made that determination, the court next analyzes whether the UST satisfied its burden to establish the second element of § 1112(b)(4)(A): "the absence of a reasonable likelihood of rehabilitation."

### ii.    "the absence of a reasonable likelihood of rehabilitation"

Section 1112(b)(4)(A) next requires the movant to establish "the absence of a reasonable likelihood of rehabilitation."   11 U.S.C. § 1112(b)(4)(A).   The term "rehabilitation" in § 1112(b)(4)(A) "refer[s] to the debtor's ability to restore the viability of its business." *Loop Corp.*, 379 F.3d at 516.  Thus, to determine a debtor's likelihood of rehabilitation, the court must weigh the debtor's business prospects to discern whether those prospects "justify continuance of the reorganization effort." 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][ii] (Richard Levin & Henry J. Sommer eds., 16th ed. 2021).  The debtor's business prospects may justify continuance of the reorganization effort if "the causes of the debtor's continuing losses can be corrected," and "the debtor or some other party in interest is capable of performing the necessary remediation." *Id.* ¶ 1112.04[6][a][ii].   In determining the debtor's likelihood of rehabilitation, the court may consider the duration and quality of the debtor's prior efforts to rehabilitate its business and formulate a reasonable plan.  *See, e.g.*, *Loop Corp.*, 379 F.3d at 518–19 (discussing the debtors' lack of efforts to rehabilitate and failed attempts to propose a viable plan).

14

The UST has not satisfied its burden to prove the absence of a reasonable likelihood of rehabilitation in this case. The UST appeared to focus at trial on proving that Neosho did not reach a binding supply agreement with Owens Corning. But the evidence the UST produced concerning the status of Neosho's negotiations with Owens Corning does not establish Neosho's business prospects. Without other convincing evidence of Neosho's business prospects, the court cannot fully analyze whether Neosho's business prospects justify continuance of the reorganization effort. As a result, the court cannot determine whether Neosho lacks any reasonably likely path to rehabilitation. For that reason alone, the UST did not satisfy its burden of proof.

Moreover, Neosho may still be able to devise viable paths to rehabilitation. For example, Neosho might still be able to rehabilitate its business and remediate the waste on its premises by negotiating a different supply agreement with Owens Corning. This path to rehabilitation is at least "reasonably likely" in light of Cameron's testimony that Owens Corning decided to not move forward with Neosho because the price and volume terms the parties had been discussing "w[ere] not economically viable." If Owens Corning withdrew from negotiations purely for economic reasons, the parties still may be able to negotiate an economically viable agreement. This possibility prevents the court from determining that Neosho lacks any reasonably likely path to rehabilitation.

And a contract with Owens Corning is not Neosho's only potential path to rehabilitation. For example, if the court determines in the pending adversary

15

proceeding that the rockwool shot belongs to Neosho, then Neosho might be able to use the shot to manufacture briquettes for a new buyer.  Conversely, if the court determines the rockwool shot belongs to Owens Corning, then Neosho could reasonably use its plant to manufacture a different product after Owens Corning removes the rockwool shot from Neosho's premises.  There may, therefore, be viable paths to rehabilitation that do not require a supply agreement with Owens Corning.

Other paths to rehabilitation may emerge.  As discussed, the circumstances of this case shifted dramatically when Owens Corning recently notified Neosho that Owens Corning did not intend to move forward with the purported supply agreement.  Neosho and its counsel have demonstrated a willingness to expend time and energy to remain in chapter 11.  In light of this demonstrated willingness and the recent change in circumstances, it is too early to determine that Neosho lacks any reasonably likely path to rehabilitation.

Because the UST did not establish "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," the court determines the UST did not satisfy its burden of proof under § 1112(b)(4)(A). The UST does not identify any other "cause" for conversion under § 1112(b), and the court is aware of none.  Consequently, the court denies the UST's motion to convert without prejudice.

16

## B. Motion to Remove Neosho as a Debtor in Possession

As an alternative to conversion, the UST asks the court to remove Neosho  as debtor in possession "for cause."  Bankruptcy Code § 1185(a) governs removal of a subchapter V debtor in possession.  It provides:

> On request of a party in interest, and after notice and a hearing, the court shall order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case, or for failure to perform the obligations of the debtor under a plan confirmed under this subchapter.

11 U.S.C. § 1185.

Congress enacted § 1185 as part of the Small Business Reorganization Act of 2019, which became effective February 19, 2020.  Because § 1185 is relatively new to the Bankruptcy Code, no governing authority outlines the standards the court should consider in determining whether to remove a debtor in possession under § 1185.

But analogous authority provides guidance.  Because § 1104(a) and § 1185(a) use the same language, the court may rely on authority construing § 1104 in determining whether to remove a debtor in possession under § 1185.  *See In re Peak Serum, Inc.*, 623 B.R. 609, 614 n.1 (Bankr. D. Colo. 2020) ("where cause would exist to appoint a Chapter 11 trustee in a standard Chapter 11 case, Subchapter V affords parties-in-interest comparable remedies, including removal of the debtor-in-possession").

Under this analogous authority, the court has discretion to determine whether "cause" exists to remove a subchapter V debtor in possession.  *See Keeley and Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship)*, 455 B.R.

17

153, 163 (B.A.P. 8th Cir. 2011) (construing § 1104).  But if the court determines cause

exists, removal is mandatory.  *Id.* (citing *In re Veblen West Dairy LLP*, 434 B.R. 550,

553 (Bankr. D.S.D. 2010)).

The movant bears the burden to establish cause by a preponderance of the

evidence.  *See Keeley and Grabanski Land P'ship.*, 455 B.R. at 163 (construing

§ 1104).  Because removal of a debtor in possession is "an extraordinary remedy," the

movant's burden is high.  *See id.* at 162 (construing § 1104).  "[T]here is a strong

presumption in favor of allowing a chapter 11 debtor-in-possession to remain in

possession." *Id.* at 162 (quoting *In re Veblen West Dairy LLP*, 434 B.R. at 553).

The court takes a "flexible" approach to determining whether cause exists to

remove a debtor in possession, balancing competing interests to determine whether

the costs of removal outweigh the benefits.  *See In re Keeley & Grabanski Land P'ship*,

455 B.R. at 163 (construing § 1104).  Among others, the court may consider the

following factors in determining whether cause exists:

> [1] the materiality of any misconduct,
> [2] the debtor-in-possession's evenhandedness or lack thereof in dealings
> with insiders and affiliated entities in relation to other creditors,
> [3] the existence of pre-petition voidable preferences or fraudulent
> conveyances,
> [4] whether any conflicts of interest on the part of the debtor-in-
> possession are interfering with its ability to fulfill its fiduciary duties,
> and
> [5] whether there has been self-dealing or squandering of estate assets.

*Id.* at 163 (quoting *In re Veblen West Dairy LLP*, 434 B.R. at 553) (construing § 1104).

The UST argues cause exists to remove Neosho as debtor in possession because

Langland, Neosho's "sole officer and director," "engaged in substantial self-dealing

and mismanagement which has cause[d] a loss to the estate" that Neosho "will not

18

seek to recover." Langland appears to concede that he caused Neosho to transfer him money and property to repay a debt Neosho allegedly owes him and that he did so after Neosho's dispute with FeHog arose and during the preference period (though he asserts defenses under § 547(c)). He also appears to concede that he recorded his purported security interests in Neosho's property during the same period and after the thirty-day safe harbor under § 547(e)(2)(A). He argues, however, that the steps he and Neosho have taken to remedy his alleged misconduct make removal unnecessary at this time.

The court agrees. Though circumstances might have appeared to favor removal at the time the UST filed its motion, circumstances have since changed. Through Langland, Neosho has competently managed the bankruptcy estate and adapted to challenges as it encountered them. Langland has obtained separate counsel to represent him in this case, demonstrated that he intends to reimburse the estate for the value of Neosho's alleged preferential transfers to him, and prioritized Neosho's interests above his own. As a result, cause no longer exists to remove Neosho as debtor in possession.

Moreover, most of the factors outlined in *In re Keeley & Grabanski Land Partnership* now weigh against removal. Factor one, "the materiality of any misconduct," presently weighs against removal because, as Neosho's current plan demonstrates, Langland intends to ameliorate his misconduct by reimbursing the estate for the alleged preferential transfers. Factor two, Neosho's "evenhandedness or lack thereof in dealings with insiders . . . in relation to other creditors," weighs

against removal because, since the petition date, Neosho has not favored Langland at the expense of other creditors and has demonstrated in its plan that it intends to ameliorate any prepetition favoritism. Factor four, "whether any conflicts of interest on the part of the debtor-in-possession are interfering with its ability to fulfill its fiduciary duties," weighs strongly against removal. Since the petition date, Langland has obtained separate counsel to represent him in this case and has spent considerable time and effort—without compensation—to ensure Neosho complied with its fiduciary duties. Langland has also mitigated the court's concerns about factor three, "the existence of pre-petition voidable preferences or fraudulent conveyances," and factor five, "any self-dealing or squandering of estate assets," by proposing to reimburse the estate for the preferential transfers, obtaining separate counsel, and ensuring Neosho fulfilled its fiduciary duties.

In light of Langland's business experience and Neosho's postpetition conduct, and balancing the interests of the debtor, creditors, and the estate, the court determines that the costs of removing Neosho would outweigh any benefits. Consequently, cause does not presently exist to remove Neosho as debtor in possession.

## CONCLUSION

For the reasons explained above, the court DENIES the UST's motion to convert this case from chapter 11 to chapter 7 and DENIES the UST's alternative

motion to remove the debtor in possession.

IT IS SO ORDERED.


Dated: 5/6/2021                                    /s/ Brian T. Fenimore
                                                  United States Bankruptcy Judge